# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brey Mafi, Brandon Clemens, Christine Kelly, James Woods, and Kristine Johnson, | Case No. |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| Equity LifeStyle Properties, Inc. and MHC Cimarron, L.L.C., | |
| Defendants. | |

## COMPLAINT

Plaintiffs Brey Mafi, Brandon Clemens, Christine Kelly, James Woods, and Kristine Johnson allege as follows on their own behalf and as private attorneys general acting on behalf of the other residents at Cimarron Park and Golf Course ("Cimarron Park" or "Park") against Defendants Equity LifeStyle Properties, Inc. ("Equity LifeStyle" or "ELS") and MHC Cimarron, L.L.C ("MHC Cimarron"):

## INTRODUCTION

1.      This lawsuit is brought to stop the unfair and predatory business practices of Defendants Equity LifeStyle and MHC Cimarron against the residents of Cimarron Park in Lake Elmo, Minnesota. Defendants' business plan is simple: Maximize profit for out-of-town owners as possible by gouging Cimarron Park residents for every last dollar while simultaneously allowing the Park infrastructure, amenities, and services to deteriorate to lower expenses. A core part of Defendants' strategy is to drive out vulnerable modest-

income Cimarron Park residents through steep rent increases, onerous new rules, and continual harassment. These actions leave Cimarron Park residents with the Hobson's choice of either staying in their homes and fighting for their rights or leaving their homes to flee a hostile living environment. Cimarron Park residents who choose to stay and advocate against Defendants' illegal practices are met with retaliation. Residents who have joined the Cimarron Park Residents Association ("Residents Association"), such as Plaintiffs, are particularly targeted. Those who leave the Park are often forced to sell for pennies on the dollar, or otherwise abandon, the largest asset they own—their home. Plaintiffs bring this action as private attorneys general on behalf of all Cimarron Park residents to stop and remedy Defendants' systematic practices that violate Minnesota consumer protection, tenant protection, and manufactured home park laws.

## PARTIES AND JURISDICTION

2.      Plaintiff Brey Mafi has lived with her husband and daughter at Cimarron Park at 167 Cimarron, Lake Elmo, MN 55042, since August 2018. Ms. Mafi and her family bought their home because of its location, the amenities, and the promise of community. Ms. Mafi was attracted by the Park's advertised amenities, such as the pool, golf course, and walking paths. Important to her family, Ms. Mafi wanted a home that she could afford to buy without incurring a mortgage. Although Ms. Mafi owns her home, she rents the lot on which her home sits. Since moving into Cimarron Park, Ms. Mafi's monthly lot rent has increased by 42%. She currently serves as the President of the Residents Association. Since joining the Residents Association, Ms. Mafi has helped the community by organizing community events, connecting neighbors to food and legal resources, and speaking out to

the media and the Minnesota Legislature regarding the conditions at Cimarron Park. Her prominent leadership at Cimarron Park has made her a target for retaliation. Since 2021, Ms. Mafi has received surprise fines, been refused services by Park management, and had her work vehicle towed. Some of her neighbors are unwilling to be seen speaking with her in public for fear of also being targeted. Ms. Mafi has nonetheless continued to be a leader of the Residents Association because she loves her community and wants to speak up for those who are afraid and for those who cannot.

3.      Plaintiff Christine Kelly moved to Cimarron Park in April 2016 and lives at 325 Cimarron, Lake Elmo, MN 55042. When Ms. Kelly bought her home at Cimarron Park, she did so because she intended her home to be her "forever home" and to retire and live in the community. As an avid armature golfer, Ms. Kelly was drawn to Cimarron Park because she wanted to have quick access to the golf course, and because she enjoyed the walking paths, accessibility, and advertised amenities. Ms. Kelly owns her home and rents the lot at Cimarron Park. Since moving into Cimarron Park, Ms. Kelly's monthly lot rent has increased by 53%. Instead of being able to retire as she intended, Ms. Kelly has had to work additional shifts to make her current lot payments. Ms. Kelly holds a leadership position in the Residents Association and frequently meets with other residents to discuss issues at the Park. In her limited free time, she prepares meals for her neighbors at Cimarron Park who are struggling, including seniors and those on a fixed income and cannot afford to both pay lot rent and buy groceries.

4.      Plaintiff Brandon Clemens and his wife and two children have lived at Cimarron Park for over fifteen years. Their home is located at 636 Cimarron, Lake Elmo,

MN 55042. Mr. Clemens purchased his home in Cimarron Park because it was offered at an affordable price by the previous owners. With small children, he was particularly excited about the Park's pool, onsite childcare, and golf course. Those amenities are now eliminated or have been made difficult to use by Defendants, and the health and safety dangers caused by Defendants' neglect at the Park have mounted. Indeed, in July 2022, Plaintiff Brandon Clemens grew so concerned about the safety risks caused by poor lighting at the Park that he wrote to Lake Elmo City Council members to alert them that at least nine street light posts had disappeared, and in their place only exposed wires remained. Mr. Clemens' home was built in 1971 and required some repair when it was purchased. Over the years, Mr. Clemens has invested time and money to upgrade his home, including the installation of new plywood siding and rubber roofing. Although Mr. Clemens owns his home, he rents the lot on which his home sits. Since 2011, the year Defendants took control of the property, Mr. Clemens' monthly lot rent has increased by 75%. Mr. Clemens holds a leadership position in the Residents Association. Mr. Clemens wants the Park to be safe and enjoyable for families, and he has led efforts to improve lighting and habitability issues in the community by contacting local agencies to attempt to address parkwide problems. Because of his involvement in the Residents Association and the age of his manufactured home, Mr. Clemens has also become the target of increased surveillance and harassment by Park staff. Mr. Clemens received a letter threatening eviction from Defendants in the past.

5.      Plaintiff James Woods purchased his 1985-model manufactured home from a former resident and has lived at Cimarron Park since 2013. His home is located at 461

Cimarron, Lake Elmo, MN 55042. Mr. Woods is a senior citizen and military veteran, who lives with a permanent and total 100% service-connected disability. While serving in the military overseas, Mr. Woods suffered a traumatic brain injury and has difficulty walking without support. Although Mr. Woods owns his home, he rents the lot on which his home sits. Since he moved in in 2013, Mr. Woods' lot rent has increased by 71% and he is concerned the lot rent will soon exceed what he can afford under his fixed monthly income. Mr. Woods holds a leadership position in the Residents Association. He frequently travels through Cimarron Park in his accessibility scooter, accompanied by his service dog, Emma Jean. He has significant difficulty using his accessibility scooter on Cimarron Park sidewalks due to the crumbling and uneven walkways. Mr. Woods is fearful to use the sidewalks in some areas of Cimarron Park. Mr. Woods wants the Park to be accessible to all residents, and leads efforts related to seniors and disabled individuals seeking reasonable accommodation from Cimarron Park. Because of his involvement in the Residents Association, Mr. Woods has been targeted by Defendants. In January 2025, Defendants filed an eviction action against Mr. Woods, alleging he violated Park rules related to the maintenance of his home. Not only was the eviction based on rules not-in-effect at the time of the alleged violation, but Defendants also failed to provide Mr. Woods the required notice concerning the alleged rule violations. Although the eviction was eventually dismissed, the incident caused tremendous stress and anxiety for Mr. Woods, who already suffers from post-traumatic stress disorder.

6. Plaintiff Kristine Johnson is a former resident of Cimarron Park, who owned a home at 265 Cimarron, Lake Elmo, MN 55042. She purchased her Cimarron Park home

in 1994, shortly before marrying her husband, and lived there with her family until 2025. When she purchased the home, lot rent was an affordable $310 a month. She loved the tight-knit community and enjoyed raising her children in the Park. The prior management company allowed her to add a third bedroom onto her home to accommodate her growing family and encouraged her to plant a garden. She and her neighbors met regularly and helped each other. Ms. Johnson and her husband also put considerable effort into maintaining and upgrading their home, which had originally been built in 1971. However, once Defendant ELS purchased Cimarron Park, Ms. Johnson started noticing changes in her community. She and her neighbors began receiving illegal and persistent notices of rule violations and were regularly harassed by Park management. Neighbors became distrustful and distant. In response, Ms. Johnson joined the newly created Residents Association and met with Park office staff to discuss resident concerns. During the COVID pandemic, Ms. Johnson took a step back from her role in the Residents Association, hoping that the group's prior efforts would result in better conditions at the Park. When that did not happen, she rejoined the Residents Association's board. After rejoining the board, Ms. Johnson immediately noticed that she had again become a target for harassment by Park staff. Upon meeting with her neighbors, she realized it was not just because of her leadership in the Residents Association, but also because she had an older model manufactured home. When her husband attempted to meet with Park staff to discuss the escalating harassment his family was facing, he was told by maintenance that their family was "nothing but trailer trash." In recent years, Ms. Johnson, like other Park residents, had felt the financial pressure of increasing rents. Although Ms. Johnson and her husband owned their home, they rented

the lot on which their home sat. Between 2011, the year Defendants took control of the property, and 2025, Ms. Johnson's monthly lot rent increased by 75%, an amount Ms. Johnson felt was unjustified. In 2025, after being repeatedly targeted by Defendants with illegal rule violation notices and eviction threats and subjected to the Park's ever-increasing-rent, Ms. Johnson and her husband were forced to abandon their home and flee. Ms. Johnson now lives in Coon Rapids, MN.

7.      Defendant Equity LifeStyle Properties, Inc. ("ELS") is the foreign, multi-billion-dollar business entity that controls the management, operation, and finances of Cimarron Park. ELS is a publicly traded self-administered real estate investment trust incorporated in Maryland, with an address of 7 St. Paul Street, Suite 1660, Baltimore, MD 21202. The principal place of business for ELS is located at Two North Riverside Plaza, Suite 800, Chicago, IL 60606. On its website, ELS touts itself as "a leading owner and operator of manufactured home communities" and that it "offers residents the unique opportunity of affordable homeownership in resort-style communities located in some of the most desirable housing markets in the country" with "attractive surroundings, premier amenities and high levels of service provided by our dedicated on-site management teams."[1] However, from its inception, the actual model of ELS has been to cut corners and exploit its residents in order to maximize the "stable revenue stream" of manufactured home communities and deliver sky-high returns to shareholders.

---

[1] https://www.equitylifestyleproperties.com/our-portfolio/mh-portfolio.

8.     Cimarron Park is one of the 452 properties in the ELS portfolio. At Cimarron, ELS controls and directs day-to-day operations. All Cimarron Park staff use email addresses with the domain "@equitylifestyle.com," and on information and belief all property management procedures, policies, and software management systems at Cimarron Park originate with ELS. ELS leadership staff such as the ELS Vice President of Public Relations and ELS Senior Vice President send letters to elected officials on behalf of Cimarron Park on Cimarron Park letterhead. When communicating decisions regarding rent increases and Park rule changes, Cimarron Park agents will state that the decisions were made by "ELS" or "corporate" and that those decisions cannot be changed.

9.     Defendant MHC Cimarron, L.L.C. is a shell company operated under the control of ELS. MHC Cimarron, L.L.C. is a limited liability company incorporated in Delaware, with a home office address of 2711 Centerville Rd #400, Wilmington, DE 19808, and a principal executive office address of Two North Riverside Plaza, Suite 800, Chicago, IL 60606. MHC Cimarron, L.C.C. is the registered property owner of Cimarron Park, with a registered address with Washington County Department of Property Records and Taxpayer Services of PO Box 2629, Addison, TX 75001. MHC Cimarron, L.L.C. has identified itself as a foreign corporation with the Minnesota Secretary of State, where it lists its sole manager as MHC Operating Limited Partnership, with a principal office address of Two North Riverside Plaza, Suite 800, Chicago, IL 60606. On information and belief, no member of MHC Cimarron, L.L.C. is a citizen of Minnesota.

10.     Defendants' public representations and filings about their business and financial operations reveal that they function as alter egos and instrumentalities of each

other, and are controlled by the dominant corporate entity ELS. Upon information and belief, Defendants meet the following non-exhaustive factors supporting a finding of alter ego status: (1) they conduct business through wholly owned and/or closely interrelated entities; (2) they maintain offices in the same location (Two North Riverside Plaza, Suite 800, Chicago, IL 60606); (3) one dominant person or entity holds itself out as having substantial control of the other entities and does in fact have substantial control (ELS); (4) the corporate relationship is a convenient way for the dominant person or entity to organize its own business (Cimarron Park is listed on ELS's website as part of ELS's "portfolio" of "more than 200 manufactured housing communities nationwide"[2]); (5) the non-dominant entities do not observe corporate formalities; and/or (6) the non-dominant entities do not have independent capitalization or financial accounting and are dependent on dominant entities for funds and services.

11.    This Court has personal jurisdiction over Defendants because they do business in Minnesota, have committed the wrongful acts set forth in this Complaint at Cimarron Park in Lake Elmo, Minnesota, and thus have caused injury to Minnesota residents, and have appointed agents for service of process in Minnesota.

12.    This Court has subject matter jurisdiction over the above-captioned case under 28 U.S.C. § 1332 because (1) all Plaintiffs are citizens of different states than all Defendants, and (2) the amount in controversy exceeds the sum or value of $75,000,

---

[2] https://www.equitylifestyleproperties.com/our-portfolio/mh-portfolio/.

including compensatory damages, punitive damages, equitable disgorgement and restitution of rent, injunctive relief and reasonable attorneys' fees.

## FACTUAL ALLEGATIONS

**A. Manufactured home communities provide critical affordable housing infrastructure for Minnesotans.**

13.     Cimarron Park is a manufactured home park located in Lake Elmo, Minnesota, that has existed since 1967. The geographic area of Cimarron Park extends over 6 city parcels totaling 200 acres and has approximately 505 manufactured homes. In manufactured home communities, such as Cimarron Park, a resident can either own or rent the manufactured home in which they live. The manufactured homes themselves are situated on rentable plots of land controlled by park owners. All residents of a manufactured home community, whether home owner or home renter, pay lot rent. Lot rent is a monthly fee a resident pays to lease the plot where their manufactured home sits and to access park amenities.

14.     Manufactured home communities, such as Cimarron Park, provide an important source of affordable housing and a critical pathway to homeownership for those with low- to moderate-incomes. As of 2024, the median sales price for a site-built home in Lake Elmo was $664,500. In comparison, the average sales price for a new manufactured home in Cimarron Park was only $76,500. Cimmaron Park serves an essential source of

affordable housing in the Lake Elmo community. In fact, in 2016, 77% of the City of Lake Elmo's affordable housing supply was located in Cimarron Park.[3]

15.     Despite being a critical source of affordable housing, manufactured home communities can yield incredible profits for their owners. Unlike traditional apartment complexes, owners of manufactured home parks are not responsible for the homes themselves. As a result, the maintenance costs and property taxes associated with those homes are shifted to the resident. Defendants themselves acknowledge the benefits gained because of the power imbalance between residents and owners. In their 2024 annual report,[4] Defendants noted that they were able to "achieve and maintain a stable rate of occupancy" because "moving a factory-built home from one property to another involves substantial cost and effort" and "customers often sell their homes in-place (similar to site-built residential housing), resulting in no interruption of rental payments." The low overhead costs and captive resident base result in substantial profits for park owners.

16.     Defendants have been able to reap extraordinary profits by exploiting these features of manufactured home communities. For over 20 years, ELS has consistently increased its dividend payout for shareholders. The financial numbers as of 2023 are staggering. Since the company's initial public offering in 1993, shares of ELS have had a total return of 6,953%–far higher than the S&P 500's return of 2,353%. Samuel Zell,

---

[3] METROPOLITAN COUNCIL, MANUFACTURED HOME PARK PRESERVATION PROJECT, AN EQUITY INITIATIVE GRANT PROJECT 23 (2016),
https://www.lrl.mn.gov/docs/2017/other/171194.pdf.
[4] https://equitylifestyle.gcs-web.com/static-files/55b9b16c-8a38-4d10-9512-f453efd18c0a.

Chairman of the ELS Board of Directors from 1993 until his passing in May 2023, and a recognized founder of the modern real estate investment trust, was believed to have been worth $5.3 billion. The current CEO of ELS, Marguerite Nader, earns over $4.2 million a year, with a compensation package primary based on ELS stocks and performance bonuses. However, these sky-high returns and compensation packages have been on the backs of Defendants' identified clients of retirees, first time homebuyers, and those seeking a lower-cost homeownership alternative.

**B.  Minnesota law provides reinforcing statutory protections to Plaintiffs and other Cimarron Park residents to protect Minnesotans from exploitation by manufactured home park owners like ELS.**

17.     Because of the potential risk of abuse and exploitation by manufactured home park owners, Minnesota law provides broad legal protections to manufactured home park residents, including the residents at Cimarron Park, under Chapter 327C. "Minnesota has long regulated the mobile home park industry to protect park residents." *Skyline Vill. Park Ass'n v. Skyline Vill. L.P.*, 786 N.W.2d 304, 311 (Minn. Ct. App. 2010) (citation omitted). "The rationale for the special protection of manufactured-home-park residents is that residents are typically low- to moderate-income persons who have made a substantial investment in their homes that is at risk because they only rent the land on which the homes are situated. Once on site, the homes are costly and difficult to move, putting park owners in a superior bargaining position." *Id.* (internal citation omitted). Thus, the Minnesota Legislature has strengthened Chapter 327C over the years to grant residents robust statutory rights that, among other things, "severely limit[s] no-cause eviction," "prohibit[s] substantial modification of a preexisting lease" and prevents park owners from retaliating

against park residents who assert their rights in response to unlawful conduct by park owners. *Id.* at 312.

18.     Chapter 327 of the Minnesota Statutes further regulates the operation of manufactured home parks to protect the health and safety of residents. For example, section 327.15, subdivision 1 imposes a licensing requirement: "No person, firm or corporation shall establish, maintain, conduct or operate a manufactured home park [] within this state without first obtaining an annual license[.]" It imposes a number of health and safety rules on park owners, including that "[a] responsible attendant or caretaker shall be in charge of every manufactured home park [] at all times, who shall maintain the park or area, and its facilities and equipment in a clean, orderly and sanitary condition." Minn. Stat. § 327.20, subd. 1(1).

19.     Chapter 327 also empowers the Department of Health to issue its own regulations, which "shall have the force of law," "for the operation and maintenance of manufactured home parks [] and for safeguarding the health and safety of persons occupying licensed manufactured home parks." Minn. Stat. § 327.20, subd. 2. These state regulations include the requirement that "[t]he walkways, drives, and other used portions of mobile home parks shall be lighted during the hours of darkness." Minn. R. 4630.1300. Any attempt by the park owner to modify residents' statutory habitability rights are strictly prohibited: "Any attempt to waive or circumscribe any privilege or right guaranteed by law to a [manufactured home park] resident . . . is void." Minn. Stat. § 327C.02, subd. 4.

20.     Cimarron Park residents are also protected by Minnesota's tenant protection laws, which require that landlords must "maintain the premises and all common areas in

compliance with the applicable health and safety laws" under Minn. Stat. § 504B.161, subd. 1(a)(4). In *Fritz v. Warthen*, 213 N.W.2d 339 (Minn. 1973), the Minnesota Supreme Court recognized Minn. Stat. § 504B.161 as creating a "statutory right" for residential tenants. *Id.* at 340-41 ("As a part of tenants' rights legislation enacted by the 1971 legislature, a landlord is now held . . . to covenant to keep leased residential premises . . . in compliance with applicable health and safety laws."). Minn. Stat. § 504B.161, subd. 1(b) specifically states that it is unlawful for a landlord to attempt to waive or modify the tenant's statutory habitability rights: "The parties to a lease or license of residential premises may not waive or modify the covenants imposed by this section."[5]

21.     In Washington County, where Cimarron Park is located, manufactured home parks are also regulated by a county ordinance designed to protect the health and safety of park residents. Washington County, Minn., Manufactured Home Park, Recreational Camping Area, and Youth Camp Ordinance § 182, ¶ 7. Through this ordinance, Washington County has imposed a licensing requirement, *id.* ¶ 5, and has expressly adopted state standards related to minimum health and safety requirements in manufactured home parks, including the requirements under section 327.20, subdivision 1(1) that "[a] responsible attendant or caretaker . . . shall maintain the park or area, and its facilities and equipment in a clean, orderly and sanitary condition," and under Minnesota Rule 4630.1300 that "[t]he walkways, drives, and other used portions of mobile home

---

[5] Minn. Stat. § 504B.161 expressly applies to "manufactured home parks" and "manufactured home park residents" under the definitions given the terms "residential building" and "residential tenant" in Minn. Stat. § 504B.001, subdivisions 11 and 12.

parks shall be lighted during the hours of darkness." Washington Co. Ord. § 182, ¶ 7.1 (adopting Minn. Stat. § 327.20 and Minn. R. 4630).

22. Finally, the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69 ("MCFA"), provides broad legal claims that (1) impose liability on a wide range of unfair conduct in connection with a wide range of commercial and business relationships and (2) enable any plaintiff directly or indirectly injured by that unfair conduct to seek a wide range of equitable and monetary remedies, as well as costs of investigation and reasonable attorney's fees and costs. *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 8-14 (Minn. 2001). "[T]he public purpose of consumer fraud statutes [is] to protect those who cannot protect themselves." *Peterson v. BASF Corp.*, 618 N.W.2d 821, 826 (Minn. Ct. App. 2000). As the Minnesota Supreme Court has explained, "'In passing consumer fraud statutes, the legislature clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law.'" *State v. Minn. Sch. of Business, Inc.*, 935 N.W.2d 124, 133 (Minn. 2019) (quoting *State by Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 790 (Minn. 1993)). "[T]he elements of MCFA claims are distinct from common-law fraud actions and broaden the relief against fraud available to consumers." *Id.* Minnesota courts have repeatedly confirmed the availability of MCFA claims brought by renters in connection with deceptive conduct by their landlords. *Love v. Amsler*, 441 N.W.2d 555, 559 (Minn. Ct. App. 1989) ("An interpretation of the [MCFA] to include residential leases would provide a mechanism to halt the use of deceptive landlord practices which take advantage of an already unequal bargaining position."); *Thompson v. St.*

*Anthony Leased Hous. Assocs. II, LP*, 979 N.W.2d 1, 7-8 (Minn. 2022) (tenant has standing to assert MCFA claim based on misrepresentations related to lease).

23.     Defendants' conduct in this case violates Plaintiffs' statutory protections under the foregoing laws. Defendants' systematic violations of these laws are enforceable by individual Plaintiffs here under the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31, subdivision 3a. *See* Minn. Stat. § 327C.15; Minn. Stat. § 504B.501; *Findling v. Group Health Plan, Inc.* 998 N.W.2d 1, 6-7 (Minn. 2023). As the Minnesota Supreme Court has explained: "Essentially, a person who brings a claim under section 8.31, subdivision 3a, is stepping into the shoes of the Attorney General and seeking relief on behalf of the broader public." *Findling*, 998 N.W.2d at 12. For that reason, section 8.31, subdivision 3a "provides both compensatory damages remedies **and** equitable remedies (like an injunction) for **systematic practices** that violate the ["law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade"] and affect more than just the individual bringing the claim." *Id.* (emphasis in original). Plaintiffs suing under the Private Attorney General Statute act as a "supplemental force of private enforcement to address unlawful trade practices" and "to protect **public** rights in the interest of the state." *Ly v. Nystrom*, 615 N.W.2d 302, 313 (Minn. 2000) (emphasis in original).

**C. Unsatisfied with merely collecting the high profit margins already allowed by state and local law, Defendants have violated Minnesota law and injured all Cimarron Park residents by removing promised amenities and services, causing infrastructure to deteriorate, failing to adequately address health and safety dangers, and adopting hostile management practices to drive profits higher.**

24.     Cimarron Park residents are protected by state and local law, which requires any park owner to apply for licenses, maintain the park in compliance with state and local law, and submit to periodic inspections to ensure safety. As the Minnesota Court of Appeals has recognized: "The rationale for the special protection of manufactured-home-park residents is that residents are typically low- to moderate-income persons who have made a substantial investment in their homes that is at risk because they only rent the land on which the homes are situated. Once on site, the homes are costly and difficult to move, putting park owners in a superior bargaining position." *Skyline Vill. Park Ass'n v. Skyline Vill. L.P.*, 786 N.W.2d 304, 311 (Minn. Ct. App. 2010) (internal citation omitted). All of these factors are present at Cimarron. Some residents at Cimarron Park have lived there for more than 30 years, while some new residents move in each year. Some residents purchased their manufactured homes when they moved into the Park, while some residents rent their manufactured homes from Defendants. Regardless of whether the resident owns or rents their home, all residents sign a lease and pay lot rent to Defendants.

25.     Keeping in line with its business practice to acquire and manage "[p]roperties that have strong cash flows" Defendants purchased Cimarron Park in 2011.[6] As part of its business decision to purchase Cimarron Park, Defendants considered the terms of current resident leases and usage rights, and also the state and local regulatory environment of the

---

[6] EQUITY LIFESTYLES PROPERTIES, 2024 ANNUAL REPORT, 8, https://equitylifestyle.gcs-web.com/static-files/55b9b16c-8a38-4d10-9512-f453efd18c0a.

community in which the Park is located. Defendants applied for and obtained state and local licensure to own and operate Cimarron Park.

26.     Immediately upon purchasing Cimarron Park, Defendants began a campaign to shed as many costs as possible in violation of state law while still luring Minnesotans into the Park to increase profits. Defendants entice Minnesota renters and manufactured homeowners to purchase lots at Cimarron Park with numerous promises and representations that are, in fact, not true: "Located in scenic Lake Elmo, MN[,] Cimarron Park is a family oriented, pet friendly mobile home community which offers your family an abundance of activities and amenities."[7] Defendants advertise facilities and amenities such as "miles of walking paths, a playground, basketball court, resident exclusive golf course, [and] community swimming pool." Defendants display photos showing well-maintained and safe streetscapes and Park grounds. Defendants have represented that "Cimarron Park also has on-site management to ensure your peace of mind." As set forth below, these representations are false and deceptive.

27.     Defendants use these promised facilities, services and amenities to justify some of the highest lot rents in the state of Minnesota. In 2020, lot rent was $777. Today, lot rent is $1,019, representing an over 31% rent increase in just the past five years. This means that compared to what they were paying in 2020, Plaintiffs and other Park residents now pay $2,904 more per year to simply rent the land on which their homes sit. The cost increase far surpasses cost-of-living adjustments to social security or other benefit

---

[7] https://mymhcommunity.com/Communities/Minnesota/CimarronParkGolfCourse/.

programs over the past five years, which many Cimarron Park residents rely upon to pay lot rent. And the actual facilities, services, and amenities at Cimarron Park fall far short of the promises and representations made by Defendants and fail to justify rent increases in the amounts instituted by Defendants.

28.     Defendants' false representations begin with the massive bait and switch they have pulled on residents and prospective residents by advertising the complex as "Cimarron Park & **Golf Course**" when in fact they no longer maintain a functional golf course. The namesake golf course at Cimarron Park and its "clubhouse" are featured prominently on promotional materials, as seen in the below photos:

## COMMUNITY OVERVIEW

### Cimarron Park & Golf Course

901 Lake Elmo Ave N.
Lake Elmo, MN 55042

**Call Us Today To Arrange Your Private Tour!**

**(855) 648-2549**







In reality, as shown in the following pictures taken in July 2023, the golf course is unmaintained and unusable, and has been closed to the public for several years:



29.     Park residents are unable to use the golf course for play. The putting greens are full of divots and ridges, and the adjoining fairways—or perhaps sand traps—are bare dirt. In recent seasons, Park management has told residents they "are not cutting holes on putting green or putting out flags," abandoning the most basic aspects of golf course

maintenance. The golf course's "clubhouse" no longer has an active concession stand and remains empty most days. Defendants repeatedly tell residents that the golf course is permanently closed and that the golf course will instead be used to put new homesites onto the Park. Despite the unusable state of the golf course, and Defendants' apparent future plans to do away with the course entirely, they still advertise the course as an available amenity.

30.     Defendants also promised on their website that Cimarron Park "has on-site management to ensure your peace of mind." In fact, there is no permanent on-site management, and Defendants have a practice of keeping the office closed most days each month. Agents of Defendants often close the office without notice during sensitive times such as the beginning of each month when rent is due. After creating this barrier to paying rent or resolving payment disputes at the office, Defendants will then charge late fees to Park residents. Moreover, as set forth below, Defendants regularly engage in harassment, intimidation, and retaliation against Park residents that is the opposite of "ensuring" their "peace of mind."

31.     But the Defendants' most dangerous conduct is their strategy of allowing the infrastructure to deteriorate and known health and safety risks to go unaddressed. On their website, Defendants have displayed a 360-degree panorama of the Park's purportedly pristine "streetscape" that includes a pop-up message claiming that each resident can "walk your dog along the friendly neighborhood streets of Cimarron Park."



32.    In reality, however, walking around Cimmaron Park is a dangerous activity. Sidewalks and streets throughout the Park have been left to crumble or are missing paved segments entirely, making it difficult or impossible for elderly or disabled residents to safely move around the Park:



33.    The danger of the crumbling sidewalks and streets is multiplied by the Park's lack of adequate street lighting. The Park has a curvilinear road system that weaves through

the manufactured home lots, which limits forward visibility and creates blind spots for drivers. The Park's inadequate lighting poses a substantial safety threat to any residents walking in the Park in the dark, including children walking to the bus stop on school days. By failing to meet basic lighting standards required under local health and safety codes, Defendants have created an unsafe living environment for the hundreds of families that live in Cimarron Park.

34. In October 2022, staff from Washington County's Department of Public Health and Environment conducted an inspection of the Park and found that the "existing night lighting [wa]s inadequate" and "cul de sacs, other areas of streets, some sidewalks, dog park, etc., are either not lit or have poor lighting." The County ordered Defendants to submit a plan to provide "adequate night lighting for all walkways, streets, and other public areas within the Park" by December 2022. In May 2023, five months after the initial compliance deadline, and seven months after the initial inspection, Defendants had failed to submit the required lighting plan. As a result, the County again ordered Defendants to submit a detailed lighting plan, reiterating that "existing lighting throughout the park is inadequate or non existent." By October 2024, Defendants had finally submitted a lighting plan to the County, but had not yet installed adequate lighting in the Park, a problem that persists to this day, two-and-a-half years after the County first notified them of this serious violation of health and safety law.

35. In addition to the above-ground hazards at the Park, there is a serious hidden environmental danger below the ground in the Park's water system: per- and polyfluoroalkyl substances, otherwise known as "PFAS."

36.     PFAS are a group of toxic, man-made chemicals that do not break down in the environment. As a result, PFAS are commonly referred to as the "forever chemical." There is mounting evidence that PFAS can have a negative impact on a person's liver function, can decrease vaccination responses, and long-term exposure has been associated with kidney cancer. Because the specific impacts of PFAS on human health are still being developed, accurate and timely communications about the presence of PFAS in a person's environment are necessary for a person to make informed choices about the level of risk they are comfortable with when it comes to PFAS exposure.

37.     Both of the Park's wells, which provide drinking water for residents, have PFAS chemicals in amounts above acceptable levels for both state and federal regulation. The Park's water system is operated by Defendants, and Defendants are responsible for ensuring the safety and quality of the Park's drinking water. Agents for Defendants learned that PFAS was present in their water system sometime around April 2023. Around that same time, representatives from the State of Minnesota reached out to Defendants to engage them in conversations about treating the Park's water and accessing financial assistance through a state-wide PFAS settlement fund. Despite learning about the need for water treatment in April 2023, Defendants did not communicate to Park residents that PFAS had been found in their water system and would require treatment until, at earliest, June 2024. The delay in communication created confusion and worry for residents. And when Park residents sought additional information about PFAS at the Park and/or actions Defendants were taking to address the contamination, they were met with little to no information. For example, in May 2024, representatives from the State of Minnesota

communicated to Defendants that Cimarron Park residents wanted a meeting regarding their drinking water with state officials in attendance. On information and belief, that meeting never occurred. In January 2025, Plaintiff Brandon Clemens reached out to an agent of Defendants to seek more information about what Defendants were doing to address PFAS in the Park. Instead, he got rerouted to the Park's property manager who simply resent a generic letter about PFAS that Defendants had allegedly sent prior. The silence from Defendants regarding PFAS at the Park has made residents concerned, confused, and worried for their health.

38.     Defendants' failure to comply with the health and safety standards required under state and local law prohibits them from charging or collecting rent at all. In Washington County, no person can operate a manufactured home park without having first obtained a license, and "[o]nly a [p]erson who complies with the requirements of this Ordinance shall be entitled to receive a license." Washington Co. Ord. § 182, ¶ 5.3. These requirements include that the owner "shall maintain the park or area, and its facilities and equipment in a clean, orderly and sanitary condition" and that "[t]he walkways, drives, and other used portions of mobile home parks shall be lighted during the hours of darkness." *Id.* ¶ 7.1; Minn. Stat. § 327.20, subd. 1(1); Minn. R. 4630.1300. Because Defendants are in violation of these licensing requirements, they no longer have the legal right to charge and collect any rent at all at Cimarron Park, much less increase existing rents.

**D.  Defendants ignore Minnesota law and impose illegal Park rule changes as a vehicle to harass residents, force them from the Park, and impair their ability to sell their homes.**

39.     Defendants change Park rules in violation of Minnesota law and selectively enforce these rules against residents in order to increase profits and intimidate residents through both random and calculated shows of force.

40.     Under Minnesota law, park owners must give residents "at least 60 days' notice in writing of any rule change" and rules that are "adopted or amended after [a] resident initially enters into a rental agreement may be enforced against that resident **only** if the new or amended rule is **reasonable** and is **not a substantial modification** of the original [lease] agreement." Minn. Stat. § 327C.02, subd. 2 (emphasis added). A "reasonable rule" is defined as a rule:

> (1) which is designed to promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the efficient operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities;
> (2) which is reasonably related to the purpose for which it is adopted;
> (3) which is not retaliatory or unjustifiably discriminatory in nature; and
> (4) which is sufficiently explicit in prohibition, direction, or limitation of conduct to fairly inform the resident of what to do or not to do to comply.

Minn. Stat. § 327C.015, subd. 12. And a "[s]ubstantial modification" means "any change in a rule which: (a) significantly diminishes or eliminates any material obligation of the park owner; (b) significantly diminishes or eliminates any material right, privilege or freedom of action of a resident; or (c) involves a significant new expense for a resident." *Id.*, subd. 17. As such, under Minnesota law, later-adopted Park rules can be enforceable against some residents and not enforceable against others, depending on the terms of their

original lease agreement. Rather than following the statutory procedures and requirements, Defendants frequently inform residents about new Park rules through a flyer with less than 60 days notice, and create rules that substantially and unreasonably impact the daily life of residents in violation of Minnesota law.

41.     For example, on or around October 15, 2024, in the same envelope as their notice of rent increase, residents received a document called "CIMARRON PARK COMMUNITY GUIDELINES MANUFACTURED HOME COMMUNITY" with a date of "January 2025." Exhibit A. The document is 9 pages long with a 2 page "HOUSE PET AGREEMENT" attachment. *Id.* The document does **not** explicitly call out the new or changed rules. Instead, hidden among past Park rules are less favorable new rules and rules that are unreasonable or are a substantial modification of many resident leases, including those of Plaintiffs. These new rules diminish the value of residents' homes, reduce the rights of Park residents, and foster an environment of fear and hostility. Examples include:

- Any resident who wishes to sell their home within Cimarron Park must allow Defendants to conduct a time-consuming and invasive "Homesite inspection" before proceeding with a sale. To pass the "Homesite inspection," Defendants require residents to have their homes "comply" with the current "Community Guidelines" regardless of whether the rules found in those Guidelines apply to residents under Minnesota law. To coerce compliance, the rules threaten that "Any violations of the Community Guidelines must be corrected before the home is sold."

- A requirement that any existing fence be taken down before a resident can sell their home.

- Late fees increase from a nominal amount to the highest allowed under Minnesota law.

- New and significant limitations on items that can be in residents' yards, such as no trampolines, soccer nets, basketball hoops, swimming pools, swing sets, swings or hammocks, and no more than four patio chairs.

- No garage sales or fundraisers are allowed.

- No pets may be left outside unattended for any period of time, even in a fenced area.

42.     These new rules are unreasonable and a substantial modification of the original leases of Plaintiffs and many other Park residents. Some of the new rules—such as the homesite inspection, the requirement that fences be taken down prior to a home sale, and late fees assessed to the maximum allowed under state law—will result in significant new expenses for Plaintiffs and other residents and additional profits for Defendants. Other new rules—such as the prohibition on swing sets, soccer nets, and garage sales—limit Plaintiffs' and other residents' ability to enjoy their community, their homes, and the lots for which they pay $1,019 a month. The reasons for these new rules appear random in nature, and untethered from health or safety concerns.

43. Plaintiff Kristine Johnson's experience provides one example of how a show of force through enforcement of random new rules injure Park residents. After experiencing retaliation and repeated harassment by Cimarron Park staff, and while facing another imminent steep rent hike, Ms. Johnson and her husband concluded in fall 2024 that they needed to leave the Park. At the time they were looking to sell their home, the Johnson home was well-kept and boasted attractive landscaping:



The Johnsons reached out to the Park about selling their home in January 2025 and became subject to the new invasive homesite inspection. The Johnsons were told that to sell their home, they must (1) remove the fence outside the home; (2) "remove all rocks and bricks and replace with grass"; (3) replace any mismatching siding; and (4) remove all sheds. These demands significantly increased the cost and difficulty of selling their home because it was impossible to conduct many of the repairs in the winter months when the ground was frozen. These demands significantly decrease the price at which the Johnson home could be sold because homes with fences, sheds and landscaping are more desirable than

homes without these features. These demands also conflicted with the preexisting maintenance rules that apply to the Johnsons under their original lease. Ultimately, the Johnsons were unable to sell their home in the open market.

44.     An earlier example of an illegal rule change with a negative impact occurred in 2022, when Defendants unlawfully enacted a rule that forbid street parking (the "No Parking Rule"). The No Parking rule change had detrimental effects on residents, including:

- Some households were forced to split up families because only two cars were allowed on the property. Families with adult children were forced to have the adult children move out of the home or get rid of their car.

- Visitors could not access friends and family living at Cimarron Park. The rule was first enforced in the winter, and the distance from the guest parking lot to many homes is more than a 15-minute walk. The walk was dangerous due to poorly maintained sidewalks and lack of working streetlights.

- Many residents who did not comply with the illegal rule change were towed, leaving them stranded in their home and with hefty towing fees to retrieve their vehicles.

- Some residents had a hard time accessing, and/or feared losing, in-home medical care for themselves and small children, as providers were forced to walk long distances in the snow and dark to access patients.

- Instilled fear and distrust within the community. Upon information and belief, some residents moved out of Cimarron Park because of the no parking rule.

Others felt they were "stuck" and could not sell their home because no prospective buyer would want to buy a home in a manufactured home park community with such restrictive parking rules.

45.     When asked by residents, the Park's property manager stated that the purported purpose of the rule change was for "safety" because Lake Elmo City Council and fire officials had complained that ambulances and firetrucks could not navigate the Park's "narrow" roads. Plaintiffs are not aware of any instance in which a City official or fire official has contacted Cimarron Park indicating that the roads were too narrow for emergency vehicles. Plaintiffs have in fact been told by city officials that the roads are not too narrow, that no such communication to Defendants occurred, and that reports of emergency vehicles not being able to pass through the Park are "blatantly false." Thus, the No Parking Rule is not "reasonably related" to the purpose for which it [wa]s adopted" and is inherently unreasonable and unenforceable. *See* Minn. Stat. § 327C.015, subd. 12.

46.     In fact, the roads are wider than the average required by Lake Elmo city code. That is because when Cimarron Park was created, the City conditioned the Park's receipt of a conditional use permit on the Park building roads wide enough to accommodate parking on one side of the street. By instituting the No Parking Rule and failing to allow *any* street parking, Defendants were in violation of their conditional use permit from the City of Lake Elmo. Lake Elmo City officials contacted Defendants to discuss their violation of the conditional use permit in spring 2023. Yet, Defendants continued to enforce the No Parking Rule and even added "no parking" signs to the property. To date, the No Parking Rule has never been rescinded, nor has Cimarron Park reimbursed residents for costs related to the unlawful tows.

 

47.     Many months later without communication, the Park removed these signs and placed signs in the Park that only allowed parking on one side of the street.

48.     These new rules also give Defendants a vehicle for harassing residents, forcing them from their homes through threatened and actual evictions. Plaintiffs and other residents live in fear of being served a surprise eviction for alleged rule violations. Under Minnesota law, a park owner must provide a resident written 30-day notice of any alleged rule violation prior to taking adverse action. *See* Minn. Stat. § 327C.09, subd. 4. However, when residents allegedly violate Park rules, they are sometimes given less than 30 days to correct the alleged rule infraction because the violation notice is not actually delivered to the resident. For example, the first time that Plaintiff James Woods saw the violation notice that Defendants used to support their eviction action against him was as an exhibit to the eviction complaint, even though the complaint alleged that the notice had been delivered to him more than 30 days before filing. During discovery in that eviction action, Defendants were unable to produce metadata showing when the violation notice was created or other evidence supporting timely service of the violation notice on Mr. Woods. Similarly, when Christine Kelly had an eviction filed against her for alleged rule violations, she did not find out about any alleged rule infractions until after the eviction had already been filed. In the evidence submitted with the eviction, she was shocked to see allegations that she had been given a 30-day notice several times, as she had not received these notices.

49.     A primary purpose of the illegal rule changes is to provide a tool for targeting disfavored residents and retaliating against residents who assert their legal rights. For example, the Park's property manager gives some residents permission to have fences and fire pits, while others are denied or told to take down fences and remove fire pits. The

denial commonly occurs shortly after the resident asserts their legal rights against Defendants.

50.     Agents of Defendants, including Park management and maintenance staff, are often aggressive and hostile toward residents when selectively enforcing rules. Agents of Defendants will threaten to call the police after escalating the situation through aggressive and loud arguing. The conduct of Defendants' agents during in-person meetings causes fear in residents.

51.     When selectively enforcing rules, Defendants illegally invade resident homes and lots, damage their property, and reduce the value of their homes. For example, on or around March 1, 2024, agents of Defendants came onto Plaintiff Brandon Clemens lot with an excavator without proper legal notice and removed his six-foot-tall privacy fence. When Mr. Clemens asked why they were removing his fence, Defendants' agent said it "doesn't matter, the fence has to come down, that's our orders." With the fence gone, Mr. Clemens and his family now have to look at an unattractive vacant lot, which has weeds, chunks of concrete and brick, and broken glass. In addition, the privacy that the six-foot-high privacy fence provided is gone, and neighbors or passersbys have a clear view into Mr. Clemens' yard, which is situated on a corner lot in Cimarron Park. This not only impairs the enjoyment of Mr. Clemens' property but impairs the market value of his home.

52.     Defendants also confusingly conflate Park rules with state and local law by calling written permission from Cimarron Park to conduct repairs "permits" or "building permits." For some repairs, Defendants dictate that residents receive a "building permit"

from the Park. This "permit" is not related to state or local code, but is simply a confusing permission form masking as a government document:



53.    Written permission from the Park through "permit" is often withheld for reasons that are not related to health or safety.

**E.  Defendants use these tactics to displace Park residents to make even more profit.**

54.    Defendants use the above illegal actions and intimidation tactics to force residents with older homes out of Cimarron Park so that they can resell or relet the homes for a profit.

55.    Defendants target older homes for rule violations and demand costly, illegal, and impossible fixes with only 30 days to complete repairs. For example, Defendants issue rule violations notices during cold weather months for issues related to fencing, painting, and staining. Due to the cold weather, the alleged repairs are impossible to complete in the

short timeframe dictated by Defendants. Plaintiff James Woods, who owns an older-model home, had an eviction filed on him in the middle of January 2025 that identified multiple meritless rule violations, including the presence of artificial flowers, the use of decorative lattice work on his home, and complaints about his fence, which has been in place for years and protects his service dog, Emma Jean. On information and belief, Defendants filed this eviction action against Mr. Woods primarily because they knew Mr. Woods—a 100% service-connected disabled military veteran who has difficulty walking without support—would not be able to address the stated conditions when it was below freezing with snow on the ground.

56.     After issuing the rule violation notices, agents of Defendants intimidate vulnerable Park residents to either waive their legal rights and comply with their rules or sell their home at low cost to Defendants.

57.     Defendants "offer" to purchase homes from residents at low cost—often a few thousand dollars—and are told if they do not accept the offer, they will face eviction.

58.     Defendants target Plaintiffs, those who assert their legal rights, and Residents Association leaders for coercive purchase tactics. For example, Park management has told Plaintiff Mafi during conflict "if you don't like it, you should leave." Park management then offered to purchase Plaintiff Mafi's home at a low cost.

59.     In August 2024, the Park's property manager came to Plaintiff Brandon Clemens' home to do a surprise lot inspection. Despite being in fine condition, the property manager told Mr. Clemens that his "home needs a lot of work" and asked him if he had "ever heard of the buy-back program." Mr. Clemens was not interested in selling the home

he had put countless hours and thousands of dollars into repairing, and did not seek to participate in the program. Mr. Clemens believes the property manager brought up the buy-back program because his property is an older home, built originally in 1971.

60.     Plaintiff Kristine Johnson was forced to flee instead of selling her 1971 home due to Defendants' illegal enforcement of its new homesite inspection rules. Instead of fighting the alleged violations found during the homesite inspection, or spending the time and money necessary to address them, Ms. Johson and her husband decided to instead *give* their home to a Park family, whose own home had recently burned down. However, this act of generosity was prohibited by Park management, even after City officials attempted to intervene and request reconsideration. Park Management told Ms. Johnson that they "plan[ed] to demolish the home and remove it from our community," adding further that the Park is "not gaining anything by accepting your title." Upon information and belief, much like other lots in the area that families are forced to flee from, the Park will erect a new home and sell the home for a large profit.

61.     Defendants have found success with this strategy. In approximately the last 12 months, nearly 50 homes—or 10% of all Cimarron Park homes—have been sold to new home buyers. On information and belief, Defendants have been able to increase their profits by taking control of homes that residents have been unable to sell because of the oppressive homesite inspections.

**F. To increase profits Defendants charge Cimarron Park residents illegal fees on top of the exorbitant rent.**

62.     Defendants also routinely charge illegal fees to improperly extract more money from residents and to harass residents.

63.     For example, Defendants charge above-average lot rent, and when residents are late on lot rent, they face illegal fees. Many residents are immediately charged late fees that exceed the amount allowed under their leases for late lot rent.

64.     Residents are also subject to non-sufficient funds ("NSF") fees in addition to a late fee. In the rental context, NSF fees are typically charged to residents whose rental payments are declined because the associated bank account does not have enough funds to cover the payment. However, Cimarron Park's NSF fees are not related to a returned check or rejected electronic payment. When asked what the "NSF" fee is related to, agents of Defendants tell residents that it is charged to all residents who fail to make a payment. This practice essentially functions as a *second* late fee on any resident who makes a delinquent lot-rent payment.

65.     Residents are improperly charged with legal fees and eviction filing fees. These legal fees are charged to residents prior to any judgment by a court. Plaintiffs Johnson and Woods have both had close to $400 of "legal fees" charged to their accounts while they were in the midst of actively fighting the very evictions on which Defendants based their "legal charges." Although these charges provide an additional cash stream for Defendants, they have an immediate adverse impact on Park residents. For example, Mr.

Woods had difficulty paying both his utility and grocery bills during the month he was assessed "legal charges" for an eviction action that was eventually dismissed.

66. Defendants often charge arbitrary fees for alleged rule violations without providing required notices and opportunity to cure. *See* Minn. Stat. § 327C.03, subd. 5. These fees range from as low as $20 to hundreds of dollars, and are added to residents' monthly lot rent bill without a way for them to challenge the legitimacy of the bill. Plaintiffs' leases—and on information and belief the leases of other residents—do not contain provisions allowing for these arbitrary fees. Instead, residents learn that such fees will be assessed when the receive the bill. Residents are forced to either pay the bill or risk an eviction being filed against them.

67. For example, since moving into the Park, Plaintiff Brey Mafi has been charged multiple illegal fees. In November 2023, Ms. Mafi placed a small chair on her lawn with a "Free" sign on it. Within hours, the chair had been removed, and she was assessed a fee from Defendants for "trash" in the amount of $20. The chair was not placed on the curb on a day trash was collected. There were no terms in Ms. Mafi's lease that allowed for a fee of $20, nor was she given an opportunity to move the chair before being charged the fee as allowed by Minnesota law. Ms. Mafi contacted Park management, who refused to remove the illegal fee. Another time, Ms. Mafi placed pallets of bottles of water outside her home for Cimarron Park residents to use who were sensitive to the PFAS exposure from the contaminated well water. Defendants removed the pallet and charged Ms. Mafi a fee without first providing Ms. Mafi the required notice and an opportunity to remove the pallet.

**G. When Plaintiffs and other Cimarron Park residents attempt to assert their legal rights, they are met with retaliation.**

68.     Defendants repeatedly spread misinformation through signs, flyers, emails, and oral communication about residents' legal rights and the ability of Defendants to take adverse legal action against Park residents.

69.     When challenged by Park residents, Defendants' agents resort to shouting, retaliation, and scare tactics to enforce their illegal practices at Cimarron Park.

70.     For example, between 2022 and 2023, after the City of Lake Elmo informed Cimarron Park that their No Parking Rule violated its conditional use permit, Defendants repeatedly told residents that the No Parking Rule was "still in effect." The Park's property manager further threatened to tow anyone who tried to park on the street and had cars wrongfully towed from the property.

71.     When communicating with residents about their legal concerns in person, Park management has been observed yelling or threatening to call the police against residents. For instance, the Park's property manager accused Plaintiff Johnson of becoming "hostile" and threatened to call the sheriff after Ms. Johnson met with the manager to seek more information on why an eviction had been filed against her.

72.     When communicating via phone, agents of Defendants often yell or hang up the phone on the resident during conflict. Vulnerable members of the Cimarron Park community such as minors, disabled, and elderly, have been shouted at, threatened, or been hung up on by Defendants.

73.     Agents of Defendants use surveillance tactics by driving slowly through the Park on a daily basis, and frequently and illegally entering the lots of residents. Defendants' agents have idled their car outside Plaintiff Brandon Clemens home, abruptly leaving when Mr. Clemens arrived back home. Defendants' agents have entered the lots of Plaintiffs Johnson, Woods, and Clemens to take photographs of their properties, often raising their cameras above fence lines in order to see further into Plaintiffs' yards. Defendants' surveillance activities are unannounced and at times executed by staff unknown to Plaintiffs. The frequent surveillance causes residents to feel afraid. Surveillance and illegal yard entries increase after residents assert their legal rights or if, like Plaintiffs, they are a known member of the Residents Association.

74.     Defendants try to stop Residents Association activities by (1) attempting to limit Residents Association meetings, flyering, and events to business hour times when many residents are not available, (2) stating that Residents Association events cannot be held in the yards of residents; (3) telling residents and Residents Association board members that if they hold a Residents Association event the police will be called; (4) telling residents not to attend Residents Association events because the Residents Association is "illegal" and the police will be called; and (5) telling residents not to communicate with the Residents Association or its board members, including Plaintiffs.

75.     Many residents report to the Residents Association and Plaintiffs that they are afraid of becoming a "target" if they attempt to enforce their legal rights or be involved with the Residents Association. And these residents' fears are well grounded, as the majority of Residents Association board members have faced some type of adverse action

taken against them by Defendants. Since becoming board members of the Residents Association, Plaintiffs Mafi, Johnson, Kelly, and Woods have all had *at least* one eviction filed against them by Defendants. Plaintiff Johnson has had a car towed from in front of her home, and a second car almost towed when it was sitting in her driveway. Plaintiff Kelly has had her vehicles towed twice. All the Plaintiffs have been subject to frequent, sometimes daily, "lot inspections" by Park agents.

**H. Plaintiffs' private attorney general status and public benefit.**

76.     Minnesota Statutes section 327C.15 states that "Any violation of sections 327C.01 to 327C.14 is a violation of a law referred to in section 8.31, subdivision 1." Subdivision 1 of section 8.31 identifies that "the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade" as being enforceable by the private attorney general. And Minn. Stat. § 8.31, subd. 3a, also empowers "any person injured by a violation of any of the laws referred to in subdivision 1" to become a private attorney general who "may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Thus, all claims brought in this Complaint respecting Defendants' systematic unfair, discriminatory, and unlawful practices in business, commerce, and trade are brought pursuant to the private attorney general powers granted by Minn. Stat. § 8.31, subd. 3a and Minn. Stat. § 327C.15.

77.     Prosecution of this lawsuit as private attorney general is consistent with recent efforts by the Minnesota Attorney General to protect residents of manufactured home parks from violation of Minnesota housing and consumer protection laws, including

from park owners who engage in widespread habitability violations and deceptive conduct that harms residents. This lawsuit will provide a significant public benefit because the equitable relief it seeks against Defendants' ongoing wrongful practices will go beyond protecting Plaintiffs. The relief sought will also help protect other Cimarron Park residents, Park guests, residents at other ELS properties in Minnesota, and the public in general. It is clear that Defendants will not voluntarily stop their illegal practices without the prospect of injunctive relief, equitable disgorgement of improperly charged and collected rent and fees, and attorneys' fees that force them to recalculate the costs of their ongoing unlawful business practices.

**I. Defendants' unlawful conduct has caused injury to Plaintiffs.**

78.     Plaintiffs and other Park residents have been proximately injured by Defendants' systematic unlawful conduct because they have had their legal rights violated and have paid lot rent and fees that Defendants were legally prohibited from charging and collecting.

79.     In addition, Defendants have injured Plaintiffs and all other Park residents by acting with deliberate disregard for the rights and safety of others in violation of Minn. Stat. § 549.20, subd. 1, entitling Plaintiffs to seek punitive damages under this statute.

80.     Defendants (1) have knowledge of facts and intentionally disregard facts that create a high probability of injury to the rights or safety of others and (2) have deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others with respect to the unlawful conduct that includes but is not limited to:

- Steeply increasing rents while at the same time they abandon infrastructure maintenance, reduce amenities and services, and harass and intimidate residents.

- Creating an oppressive living environment through systematic harassment, intimidation, surveillance, invasion of privacy, and retaliation.

- Endangering the health and safety of residents through widespread violation of health and safety laws.

- Operating a manufactured home park without a valid license because of ongoing violation of health and safety laws.

- Imposing new rules which are unreasonable and substantial modifications of resident leases that are designed as tools to harass and intimidate residents, invade their privacy, force them from the Park, and impair their ability to sell their homes.

- Assessing unlawful fees in excess of what is allowed in resident leases and in violation of the procedural requirements found in Minn. Stat. § 327C.03.

- Retaliating against residents advocating for legal rights.

- Filing evictions against Park residents in violation of the procedural requirements found in Minn. Stat. § 327C.09, including deceptive notices of rule violations.

- Targeting older homes for rule violations and evictions, in order to acquire the older homes and relet, resell, or replace for profit.

## CLAIMS

## COUNT ONE
### Unfair Practices in Violation of Minnesota Consumer Fraud Act,
### Minn. Stat. §§ 325F.69, .70

81.     Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

82.     The Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, prohibits the "act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise."

83.     The lease and sale of manufactured homes and the lease of real property through lot rent constitutes the sale of merchandise under Minn. Stat. § 325F.68. *See Ponzo v. Affordable Homes of Rochester, LLC*, No. A04-2234, 2005 WL 1804644, at *2 (Minn. Ct. App. Aug. 2, 2005) (applying the Minnesota Consumer Fraud Act in a manufactured home case).

84.     "Unfair" or "unconscionable" practices are defined as any "act [] or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. § 325F.69, subd. 8.

85.     Defendants have committed, on an ongoing basis, unfair and unconscionable acts and practices against Plaintiffs and other Park residents that include, but are not limited to, the following:

- Steeply increasing rents while at the same time they abandon infrastructure maintenance, reduce amenities and services, and harass and intimidate residents.

- Creating an oppressive living environment through systematic harassment, intimidation, surveillance, invasion of privacy, and retaliation.

- Endangering the health and safety of residents through widespread violations of health and safety laws.

- Operating a manufactured home park without a valid license because of ongoing violations of health and safety laws.

- Imposing new rules which are unreasonable and substantial modifications of resident leases that are designed as tools to harass and intimidate residents, invade their privacy, force them from the Park, and impair their ability to sell their homes.

- Assessing unlawful fees in excess of what is allowed in resident leases and in violation of the procedural requirements found in Minn. Stat. § 327C.03.

- Retaliating against residents advocating for legal rights.

- Filing evictions against Park residents in violation of the procedural requirements found in Minn. Stat. § 327C.09, including deceptive notices of rule violations.

- Targeting older homes for rule violations and evictions, in order to acquire the older homes and relet, resell, or replace for profit.

86.     Defendants' conduct and practices violate each of the three "unfair" and

"unconscionable" criteria provided in Minn. Stat. § 325F.69, subd. 8.

87.    First, Defendants' conduct described above offends public policy as established by Minnesota laws regulating the operation and management of manufactured home parks, including Chapters 327, 327C, and 504B, because Defendants—through their actions and inactions—have violated, and continue to violate, statutory rights designed to protect manufactured-home-park residents from abuses of power and unsafe living conditions.

88.    Second, Defendants' conduct described above is unethical, oppressive, and unscrupulous. Defendants have, and continue to, actively exploit their superior bargaining power, *see Skyline*, 786 N.W.2d at 311, to establish rent levels, fees, rules, and other terms of tenancy harmful to Park residents. In return, Park residents are forced to choose between enduring ballooning costs, hostile management, and worsening infrastructure, or abandoning, for little to no money, the largest asset they own: their home.

89.    Finally, Defendants' conduct has caused and continues to cause substantial injury to Plaintiffs and other Park residents that cannot be reasonably avoided. Plaintiffs and other Park residents have suffered (1) economic injury through excessive rents, fees, and costs; (2) unwarranted health and safety risks as a result of neglected Park infrastructure; and (3) significant emotional distress caused by hostile and retaliatory Park management. Defendants' wrongful acts and practices offer no countervailing benefits to Park residents, who must pay sky-high lot rent while surrounding infrastructure, amenities, and services deteriorate.

90.    Defendants have directed and carried out these wrongful acts and practices

and continue to do so.

91.     Defendants have undertaken these wrongful acts and practices with the intent that Plaintiffs and other residents would rely on them and accept them while living and conducting activities at the Park, and continuing to make lot-rent payments and pay fees.

92.     There is a causal relationship between the injuries suffered by Plaintiffs and other residents living at the Park and the wrongful conduct Defendants have engaged in that violates the foregoing provisions of Minn. Stat. § 325F.69. Common sense factors establishing causal nexus include the facts that (1) the wrongful acts and practices described above were repeated, longstanding, and pervasive; (2) Defendants intended and understood that Plaintiffs and other Park residents would rely upon their acts, practices, and communications in the context of leasing, Park management and operation, and the charging and collecting of rent; and (3) the Park management practices of Defendants, as well as the information communicated by Defendants, are the kind that Plaintiffs and other Park residents would typically rely upon.

93.     In addition to the private attorney general statute of Minn. Stat. § 8.31, subd. 3a, this claim is brought pursuant to Minn. Stat. § 325F.70, which provides Plaintiffs a private cause of action for a claim of unconscionable and unfair acts. Section 325F.70 expressly states that "[a]n action brought under this section benefits the public."

94.     Defendants' past and ongoing unfair and unconscionable conduct has caused Plaintiffs and other Park residents injuries and damages, and threaten to cause further injuries to Plaintiffs and other Park Residents, entitling them to the relief under Minn. Stat. §§ 325F.70 and 8.31, subd. 3a.

95.     Minnesota consumer protection law allows for an additional civil penalty when an actor liable under the Consumer Fraud Act perpetrates their conduct against a senior citizen or disabled person. Minn. Stat. § 325F.71, subd. 2(a). In such a circumstance, the perpetrator "is liable for an additional civil penalty not to exceed $10,000 for each violation, if one or more of the factors in paragraph (b) are present." *Id.* The factors include: "whether the defendant knew or should have known that the defendant's conduct was directed to one or more senior citizens or disabled persons" and "whether one or more senior citizens or disabled persons are more vulnerable to the defendant's conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the defendant's conduct." *Id.*, subd. 2(b)(1), (3).

96.     Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons. One or more senior citizens or disabled persons are more vulnerable to Defendants' conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the Defendants' conduct. Defendants' conduct caused senior citizens or disabled persons to suffer damages. In addition to foregoing damages, Defendants are subject to civil penalties under Minn. Stat. § 325F.71, subd. 2 for each violation.

## COUNT TWO
### Breach of Statutory Covenants of Habitability, Minn. Stat. § 504B.161

97.     Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

98.     Cimarron Park is a manufactured home park and subject to laws protecting renters under the landlord-tenant laws codified at Chapter 504B. Specifically, a resident of a manufactured home park is a "residential tenant," the Park itself is a "residential building," the owner and operator of the park is a "landlord," and the residents have a "lease" under Minn. Stat. § 504B.001, subds. 7, 8, 11, and 12.

99.     Defendants are subject to liability under Minn. Stat. § 504B.001, subd. 7, which defines "landlord" as "an owner of real property, a contract for deed vendee, receiver, executor, trustee, lessee, agent, or other person directly or indirectly in control of rental property."

100.    Minn. Stat. § 504B.161, subd. 1(a), requires:

> In every lease or license of residential premises, the landlord or licensor covenants:
>      (1) that the premises and all common areas are fit for the use intended by the parties;
>      (2) to keep the premises and all common areas in reasonable repair during the term of the lease or license, . . . ; [and]
>      (4) to maintain the premises and all common areas in compliance with the applicable health and safety laws of the United States, of the state, and of the local units of government, including ordinances regulating rental licensing, where the premises are located during the term of the lease or license[.]

101.    Minn. Stat. § 504B.161, subd. 1(b), states that "[t]he parties to a lease or license of residential premises may not waive or modify the covenants [of habitability] imposed by this section."

102.    Defendants' actions violate Minn. Stat. § 504B.161, subd. 1(a)(1). Defendants' actions make the leased premises unfit for the intended purpose by failing to maintain safe roads and sidewalks, failing to light the Park so it is safe for residents and others to navigate at night and in early morning, failing to adequately communicate and mitigate the health risk of the presence of PFAS in the water system, failing to maintain and keep accessible Park facilities and amenities such as the golf course, and failing to staff the Park with permanent on-site park management that helps rather than harasses residents.

103.    Defendants' actions violate Minn. Stat. § 504B.161, subd. 1(a)(2) and (4). Defendants' conduct violates applicable health and safety laws, including laws related to groundskeeping, on-site park management, park lighting, PFAS, and manufactured home park licensure. Defendants' actions also leave key infrastructure in the Park in disrepair.

104.    Defendants' actions violate Washington County licensing requirements that Defendants shall maintain the Park in compliance with applicable health and safety laws, which renders invalid Defendants' license to operate the Park and makes Defendants' charge and collection of rent from residents unlawful.

105.    Defendants' actions caused Plaintiffs injury and loss of money, entitling Plaintiffs to relief under *Fritz v. Warthen*, 213 N.W.2d 339 (Minn. 1973), and Minn. Stat. §§ 504B.501 and 8.31, subd. 3a.

## COUNT THREE
## Violation of Manufactured Home Park Habitability Law, Minn. Stat. § 327.20

106.     Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

107.     Defendants are subject to liability under Minn. Stat. § 327.20, subd. 1(1), which requires that "[a] responsible attendant or caretaker shall be in charge of every manufactured home park or recreational camping area at all times, who shall maintain the park or area, and its facilities and equipment in a clean, orderly and sanitary condition" and that "[i]n any manufactured home park containing more than 50 lots, the attendant, caretaker, or other responsible park employee, shall be readily available at all times in case of emergency."

108.     Defendants' actions violate Minn. Stat. Minn. Stat. § 327.20, subd. 1(1) by failing to maintain safe roads and sidewalks, failing to light the Park so it is safe for residents and others to navigate at night and in early morning, failing to maintain and keep accessible Park facilities and amenities such as the golf course, and failing to staff the Park with on-site park management that is readily available at all times to help rather than harass residents.

109.     Defendants' actions caused, or threatened to cause, Plaintiffs injury and damages, entitling Plaintiffs to relief under Minn. Stat. §§ 327.24 and 8.31, subd. 3a.

## COUNT FOUR
### Unlawful Imposition of New Rules, Minn. Stat. § 327C.02

110.    Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

111.    Defendants are subject to liability under Minn. Stat. § 327C.015, subd. 9, which defines "park owner" as "the owner of a manufactured home park and any person acting on behalf of the owner in the operation or management of a park."

112.    Minn. Stat. § 327C.02, subd. 2, states that a "park owner must give [a manufactured home park] resident at least 60 days' notice in writing of any rule change. The statute further requires that "[a] rule adopted or amended after the resident initially enters into a rental agreement may be enforced against that resident only if the new or amended rule is reasonable and is not a substantial modification of the original agreement." Subdivision 4 renders void any attempt to waive or circumscribe those protections.

113.    Under Chapter 327C a "'Reasonable rule' means a park rule:

> (1) which is designed to promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the efficient operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities;
> (2) which is reasonably related to the purpose for which it is adopted;
> (3) which is not retaliatory or unjustifiably discriminatory in nature; and
> (4) which is sufficiently explicit in prohibition, direction, or limitation of conduct to fairly inform the resident of what to do or not to do to comply.

Minn. Stat. § 327C.015, subd. 12.

114. A "'substantial modification' means any change in a rule which: (a) significantly diminishes or eliminates any material obligation of the park owner; (b) significantly diminishes or eliminates any material right, privilege or freedom of action of a resident; or (c) involves a significant new expense for a resident." Minn. Stat. § 327C.015, subd. 17.

115. In imposing the new rules described herein, Defendants violated Minn. Stat. § 327C.02, subd. 2. The new rules are both unreasonable and substantial modifications of Plaintiffs' original lease agreements, and the lease agreements of many Park residents.

116. Defendants' new rules substantially modify resident lease agreements by significantly diminishing or eliminating material rights, privilege or freedom of action of residents. New rules related to Park-controlled approvals to alterations of a home strip residents of their right to improve the exterior of the home they own. Additional rules related to recreational items that may be left in the yard further limit what the family can do in the yard they pay for. Residents are not even allowed to host garage sales or fundraisers on their lot. Pets are all but disallowed, as they cannot be left outside unattended for any period of time, even in a fenced in area.

117. Defendants' new rules substantially modify resident lease agreements by creating significant new expenses. Through its new rules related to home inspections, Defendants attempt to trap tenants into significant new expenses before being allowed to sell their homes. The new rules impose late fees that increase from a nominal amount to the highest allowed under Minnesota law.

118. Defendants' continued enforcement of these invalid rules constitutes continuous violation of this statute.

119. Plaintiffs are therefore entitled to relief under Minn. Stat. §§ 327C.15 and 8.31, subd. 3a.

## COUNT FIVE
### Retaliation, Minn. Stat. § 327C.12

120. Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

121. Minnesota Statutes section 327C.12 provides that:

> A park owner may not increase rent, decrease services, alter an existing rental agreement or seek to recover possession or threaten such action in whole or in part as a penalty for a resident's:
>
> (1) good faith complaint to the park owner or to a government agency or official;
>
> (2) good faith attempt to exercise rights or remedies pursuant to state or federal law; or
>
> (3) joining and participating in the activities of a resident association as defined under section 327C.015, subdivision 15.

122. The term "resident association" within the meaning of Minnesota Statutes section 327C.12 includes "an organization that has the written permission of the owners of at least 51 percent of the manufactured homes in the park to represent them, and which is organized for the purpose of resolving matters relating to living conditions in the manufactured home park." Minn. Stat. § 327C.015, subd. 15. Cimarron Park Residents Association is a resident association within the meaning of this statute. Plaintiffs are leaders of the Cimarron Park Residents Association.

123.     Defendants are "park owners" within the meaning of this statute. *See* Minn. Stat. § 327C.015, subd. 9.

124.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 327C.12. This includes, but is not limited to, the following actions that are in whole or in part taken as a penalty for residents' protected activities:

- Violations of Plaintiffs' privacy through surveillance and entry upon lots.

- Interference with Plaintiffs' attempts to organize by threating to call police for organizing activities and discouraging other residents from speaking to Plaintiffs.

- Targeting Plaintiffs for alleged rule violations and evictions.

- Providing reduced services to Plaintiffs and preventing Plaintiffs from entering the office to conduct business.

125.     Plaintiffs are therefore entitled to relief under Minn. Stat. §§ 327C.15 and 8.31, subd. 3a.

## COUNT SIX
### Retaliation, Minn. Stat. § 504B.212

126.     Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

127.     Minnesota Statutes section 504B.212, subdivision 2(a) provides that:

> A landlord may not increase rent, decrease services, alter an existing rental agreement, file a legal action against a tenant, . . . , or seek to recover possession or threaten any such action in whole or in part in retaliation after a tenant:

(1) reports a code violation to a government agency, elected official, or other government official responsible for the enforcement of a building, housing, health, or safety code;

(2) reports a building, housing, health, or safety code violation, or a violation of this chapter, to a community organization or the news media;

(3) seeks the assistance of a community organization or others, including but not limited to a media or news organization, for assistance with a code violation or a violation of this chapter;

(4) makes a request that the landlord of a residential building make repairs to the premises as required by this chapter, or remedy a building or health code, other regulation, or uphold portions of the residential rental agreement;

(5) joins or attempts to join a tenant association or similar organization; or

(6) testifies in any court or administrative proceeding concerning the condition of the premises or exercised any right or remedy provided by law.

128. Defendants are "landlords" within the meaning of this statute. *See* Minn. Stat. § 504B.001, subd. 7.

129. Plaintiffs are "tenants" within the meaning of this statute. *See id.*, subd. 12.

130. Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 504B.212. This includes, but is not limited to, the following actions that are in whole or in part taken as a penalty for residents' protected activities:

- Violations of Plaintiffs' privacy through surveillance and entry upon lots.

- Interference with Plaintiffs' attempts to organize by threating to call police for organizing activities and discouraging other residents from speaking to Plaintiffs.

- Targeting Plaintiffs for alleged rule violations and evictions.

- Providing reduced services to Plaintiffs and preventing Plaintiffs from entering the office to conduct business.

131. Defendants' conduct, practices, and actions described in this Complaint are done unlawfully and in bad faith in violation of Minn. Stat. § 504B.212.

132. Plaintiffs are therefore entitled to relief under Minn. Stat. §§ 504B.212, subd. 3, 504B.501, and 8.31, subd. 3a.

## COUNT SEVEN
### Prohibition of Freedom of Expression, Minn. Stat. § 327C.13

133. Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

134. Minnesota Statutes section 327C.13 provides that:

> No park owner shall prohibit or adopt any rule prohibiting residents or other persons from peacefully organizing, assembling, canvassing, leafletting or otherwise exercising within the park their right of free expression for noncommercial purposes.
> .

135. Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 327C.13. This includes, but is not limited to:

- Defendants' attempts to through words and actions to dissuade residents from attending Cimarron Park Residents Association events and speaking to Residents Association board members.

- Prohibiting residents from hosting organizing activities, canvassing or leafletting during nighttime hours that are accessible to working residents and Cimarron Park board members.

136.    Plaintiffs are therefore entitled to relief under Minn. Stat. §§ 327C.15 and 8.31, subd. 3a.

### COUNT EIGHT
### Violation of Private Access Limitations, Minn. Stat. § 327C.14

137.    Plaintiffs restate and reallege all other paragraphs in this Complaint as if fully stated and alleged herein.

138.    Minnesota Statutes section 327C.14 provides strict limits on a park owner's right to access a residents' home and lot:

> Subdivision 1. To the home.
>
> A park owner has no right of access to a manufactured home located within the park unless access is necessary to prevent damage to the park premises or to respond to an emergency.
>
> Subd. 2. To the lot.
>
> A park owner may come onto a manufactured home lot in order to inspect the lot, make necessary or agreed-upon repairs or improvements, supply necessary or agreed-upon goods or services or exhibit the lot to prospective or actual purchasers, mortgagees, residents, workers or contractors. The park owner may come onto the resident's lot whenever necessary to respond to or prevent an emergency, but otherwise may not come onto the lot at unreasonable times or in a way that unreasonably disrupts the resident's use and enjoyment of the lot.

.

139. Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 327C.14. This includes, but is not limited to:

- Entering the lot without notice, before or at the time of entry at irregular times.

- Entering lots multiple times per month as a form of surveillance or intimidation.

- Entering lots by agents who are not in uniforms or known to be agents of Defendants.

- Entering the lot to remove personal property or fixtures from residents without permission.

140. Plaintiffs are therefore entitled to relief under Minn. Stat. §§ 327C.15 and 8.31, subd. 3a.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief against Defendants as follows:

1. A declaration that Defendants violated each of the laws that form the basis of relief.

2. An injunction enjoining Defendants from future violations of the laws that form the basis of relief.

3. An injunction ordering Defendants to perform all maintenance, repair, and renovation work at Cimarron Park in compliance with health and safety law.

4. An injunction ordering Defendants to stop charging rent until they perform all maintenance, repair, and renovation work at Cimarron Park in compliance with health and safety law.

5. An injunction ordering Defendants to stop retaliating, and other prohibited activities in violation of Minn. Stat. Chapter 327C.

6. Equitable relief in the form of rescission, restitution, and/or disgorgement of all rent, lot rent, and fees paid and charged

7. An award of compensatory and consequential damages, including the amount of all rent, lot rent, and fees paid.

8. An award for a civil penalty pursuant to Minn. Stat. § 325F.71.

9. Punitive damages and penalties under Minn. Stat. § 549.20, and any other statutory and common law grounds.

10. An award of reasonable attorneys' fees and costs for litigation and investigation under statutes identified in this Complaint.

11. A finding that Defendants are jointly and severally liable for damages, equitable relief, and attorneys' fees and costs awarded in this case.

12. Such other relief that the Court deems just and equitable.

13. Plaintiffs invoke their right to a jury trial on all claims relevant to a jury trial.

**HOUSING JUSTICE CENTER**

Dated: June 10, 2025

*/s/ Shana L. Tomenes*
James W. Poradek (#0290488)
Shana Tomenes (#0400802)
Abigail Hanson (#0402944)
Northwestern Building
275 East Fourth Street, Suite 590
Saint Paul, MN 55101
jporadek@hjcmn.org
612-723-0517
stomenes@hjcmn.org
651-315-1221
ahanson@hjcmn.org
651-391-8393

**ATTORNEYS FOR PLAINTIFFS**